Hear ye, hear ye, this Honorable Appellate Court for the 2nd District is now open. The Honorable Justice Susan Hutchinson presiding, along with Justice Anne Jorgensen and Justice Mary Shostak. The case is No. 219-1124, Susan Brichetto, Plaintiff Appellant v. Plainfield Community Consolidated School District No. 202, Defendant Appellee. Arguing for the Appellant, Wilton A. Person. Arguing for the Appellee, Erin K. Walsh. Good morning, Council, and thank you this morning for being with us. So we can proceed then with Mr. Person. Thank you.  May it please the Court. My name is Wilton Person, and I am the, one of the attorneys for the Appellant, Susan Brichetto. As the Court is aware today, we're asking the Court to reverse the summary judgment that was entered on November 27, 2019, based upon five distinct reasons. Today, we will discuss two of the key reasons why Brichetto believes that the summary judgment was entered improperly. The first reason that the trial court improperly granted the district's motion for summary judgment is because there was a 2015 motion to compel order that was pending subject to the district's motion, and that's critical to Ms. Brichetto's claim. And just to provide a brief context, Ms. Brichetto was attending her granddaughter's track meet at Plainfield South in Plainfield, Illinois, and at that time, she was injured when she tripped and fell over a pole vault that was in a pedestrian walkway, and subsequently, as a result of that, she suffered a fractured leg. Now, the motion to compel is very interesting in this case because it was not, it was never complied with by the district. The order stated that it was to be produced by December 6 of 2019, and just for reference, this is attached to the appendix as A43 and also the common law record 726. Now, I will read the order briefly for the panel, and essentially, it says that plaintiff's motion to compel is granted to the extent that the defendant must provide the plaintiff with a sworn verification identifying the specific timestamps on the video footage produced in this matter pursuant to plaintiff's discovery request, and that the video is the only footage in its possession to be produced by December 6, 2019. Now, what's interesting about this particular order is Flanagan, and Ryan Flanagan is, or was at the time, the assistant athletic director for the district, and it is noted on the record, and this is C254 and 255, and based on this deposition, it provides more context as to why this evidence is so critical. Co-counsel Gina Gross Romanale conducted this deposition. Question on C254, question posed to Ryan Flanagan, as you sit here today, do you have any knowledge about how it is that a pole vault pole came to be in the pedestrian pathway? Is he cutting out for anyone other than just me? No, I thought it was me. The answer, I do have knowledge of it being placed there by another person, and I'm not sure who that person was. Question on C255, and how did you, how did you come to that knowledge? Was it from viewing the video? Answer from Ryan Flanagan, correct. So based upon that particular aspect of the deposition, it is clear that the district, at least based on Ryan Flanagan, had knowledge that there was additional footage available that for some reason was not produced to the plaintiff in this action. So this is the evidence that's related to this particular motion to compel, that the district was required to produce an affidavit saying that no footage was available, no longer in its possession. But clearly based upon Mr. Flanagan's statements. Mr. Person, we've lost you again. Go ahead. Okay, and just to just clarify, basically I was saying that the order, motion to compel was relevant because of the testimony of Ryan Flanagan. I just want to make sure that the panel heard that argument. Yeah. Okay. Yes. Okay. So based upon that particular order, it was evident to the plaintiff, at least at that time and continuing throughout the discovery that the district was privy or watched additional footage that the plaintiff did not have. And that's one thing in terms of this motion that I wanted to, in terms of this appeal, I wanted to point out why this evidence is so critical. And in this case, the trial court judge issued the summary judgment. And the data is very important on November 27th. While the particular motion to compel order was still pending. It had not been produced by the district. I'll be a day where they had not complied because these numbers, they obviously had not arisen at that point. Now, this, this does tell into. Another reason why the summary judgment was improper, which is typically the standard. Is that. A genuine issue of material facts is raised because. In this case, the trial court never considered. All of the evidence and this evidence, albeit if the district had produced an affidavit stating as such. That there was no additional footage available, which we now know. Based upon planning, Mr. that there was. That this was evidence that the trial court did not consider. And the standard for the summary judgment granting of a summary judgment is the court is aware is that the evidence all evidence. Is viewed in a light most favorable to the non moving party in this case. Susan. So, based upon that alone, those 2 factors and those are the 2 important. Most important issue. That I wanted to address today would ask that the court. Reverse, or vacate the November 27th, 2019 branding of summary judgment on all accounts. Now, in this case, the district also raised. 3 separate immunity. 1 on the section 3 dash 106. 1 under section 3 dash 108. And another immunity section under that 1 dash 109. And section 2 dash 2 or 1. Now, because these are issues that were addressed in a written brief and they're more straightforward. The focus of the appellants, Mr. shadows. Or argument today was just on that motion to compel. Still be impending when the court granted the summary judgment motion also the fact that this raised a genuine issue. A material fact, so with respect to those immunity. The appellant will rest on the written brief. But is available to answer any questions related to the case law or any questions the panel may have about that. But in this case, this is a very straightforward case where. This grandmother was watching her granddaughter. Attend a track participate in a track meeting was injured. And believe that it is in the interest of justice that this goes back to the trial court. That is reversed and vacated. Thank you. All right, thank you very much. Mr. person. I will ask just the Shasta. Do you have any questions that you would like to ask? Thank you. Yeah, I do have I do have a few questions just to clarify. Your position, so you're indicating that prior to. The defendant indicating to you. That they no longer had the tape. That prior to that. Why a while prior to that. On December 6, they were, they were supposed to produce a video by December 6 and then that was never followed up with. Is that what you're saying? No, I guess to clarify. Based upon the initial conversation and deposition with Mr. plan again. That he watched additional footage now, going back to this particular order on November 15th, the court, because the again, the district is indicating we don't have any more footage. We don't have any more footage. Which is contrary to what Mr. again, maybe it was withheld. Maybe it was destroyed. We don't know. But at that point in the 15th, the district was supposed to comply. With providing an affidavit to identify the specific timestamps on the video. And also stating on under an affidavit under 109, the only footage in its possession, at least at that time. That's what had been produced. So, that's that's really the answer to that. Whether regardless of who left the pole vault there. Yes, a student from. The host school, whether it was a student from the other school, how is that going to affect. Immunity under any of the sections of immunity were cited to 109 to 101 to 31063108. I mean, how is that going to make it any difference? Whether you have and identify who it was that left that pole vault. Well, the, the differences is really with respect to the willful and wanton primarily. Now, the, the different immunities that are addressed, you are, I mean, you are correct that there are different case law that. Not solve certain aspects of that with respect to ordinary negligence. So, primarily the issue with the video has to do with the willful and wanton aspect only. So, it doesn't necessarily, it's not completely related to knocking out the immunity or basically saying that the district did not establish it. But only with respect to willful and wanton is the aspect because we don't frankly, the plaintiff doesn't know how the pole vault came into the pedestrian walkway or how long it had been there. So, it only applies or is only applicable to the willful and wanton count. But in the willful and wanton count, you have to show an actual deliberate intention to cause the harm. Or if it's not intentional, an utter disregard or a conscious disregard for the safety. And how are you going to prove that when the testimony at the depositions is they were not made aware of this condition? How are you going to get past 3106 and 3108? Because it was more, it was a condition of the property, true. But didn't they have to have notice of that? And can you prove that? Yes, sure. Well, I don't, in fact, I don't necessarily agree as a condition of the property. Because in the brief, the written brief, we cite McEwen that basically states that it was not a condition of the property, that it would go outside of the immunity or the district establishing immunity. Now, what would have happened with this case procedurally is this, frankly. If, for example, if the district had produced this affidavit, at that point, this would have actually created a potential third count against the district under what's called a negligent exfoliation count. So, this. Oh, yeah. Go ahead. No, I was that was going to be my next question was, it was a free relation, but go ahead. Yeah, so the negligent exfoliation obviously is based upon that. That this this particular instance, obviously, we have testimony that says it's not willful and wanted, but the fact of the matter is. That this footage was either withheld or destroyed by the district, at least that that would be the assertion on their negligence foliation count that we just don't know the plaintiff the grandmother in this case. Percetto does not know what happened or how long the poll wall had been there. I know I hear what you're saying. It's still I'm still wondering, even if the video was produced and it shows, as I think the one that said, there was a pole vault lying there. I'm still struggling with, you know, notice and or and, you know, it's a deliberate or just total disregard for the property for the safety of others. I mean, but I see what you're saying with a spoilation count and I will talk to your opponent about that as well. So thank you for answering the question. I think that's pretty much all I have. So, your position then is that this was a premature grant of the summary judgment. Yeah, I guess that's that's a really a more accurate representation that is premature that all the evidence needed to be considered for the court to rule. Now, the negligence in terms of the exceptions, those are addressed. But frankly, that's true that this, this particular ruling was premature because all the evidence was not considered by the court. Thank you, sir. I have no further questions. Justice Hutchinson. Thank you, Justice Jorgensen. Do you have any questions, please? I do counsel. I am very troubled by the posture of your motion to compel. I mean, I'm the motion was going to go forward. The argument on that motion, the motion to compel had not been complied with. Correct. Well, right. I mean, at the time, the summary judgment motion was going forward. The motion to compel and not been complied with. Correct. And it's my understanding from the record that the plaintiff basically waived any objection with respect to that. Well, that's what the district alleges in their response for you. But I don't think that is actually accurate because if you look at if you look at the record itself. Go ahead. That's right. I didn't mean to cut you off. Sometimes it's hard to hear here. Okay, so if you look at the record itself, the record states in the actual written brief by the trial counsel, the issue of the video is addressed in the written brief. And secondly, and most importantly, even after the statement that the district is framed as a, some type of waiver or voluntary waiver, even an argument. The, this, this face the same thing regarding the video that, and this is in the reply from this shadow. That the same arguments are made in terms of the video being very critical and very important. So, the interpretation that a single statement is a waiver, I think, is, is, is frankly, is a stretch in consideration of the written brief and also the argument that was made only a few minutes later. Did you did anyone included in a motion to reconsider the, the grant of emotion for summary judgment for the defendant. Well, based based on the motion to reconsider is based upon my understanding is based upon new evidence or something that. I mean, new evidence is some, some case law or something that was not in place at the time. So it didn't seem that it would be appropriate to file a motion to reconsider at that point. Okay. And, you know, again, not to beat a dead horse here as just a shot that mentioned, where's your evidence of anything that rises to willful and wanton conduct here. Here's, here's the thing is that the video. I mean, Ryan Flanagan stated in his deposition, he watched the video. We don't know what that video shows. So, I mean, to say that. That is no evidence, right. Okay. There's no evidence that leads into the negligence foliation claim because I'm not saying that the district. Necessarily did something. I mean, that's the assertion is willful and wanton. But the fact of the matter is that no 1 knows, because Ryan Flanagan saw a video that the plaintiff was not privy to. So, it is really no evidence there that shows 1 way or the other, because I believe that video is very critical to the consideration, whether it's willful and wanton. We don't know what happened. Someone could have run out there and done some. I don't know. We don't, we don't know. So, I can't really speculate as to what that video would have shown other than what Mr Flanagan stated that it did show. Okay. I have no further questions. Thank you. Thank you. Thank you. Justice Jorgensen. I have 1 or 2. Mr. Person, when was Mr. Flanagan's deposition taken? An approximate date. You don't have to give me an exact date. It was taken August 29, 2018. So, we had, that was the basis of your requesting then the additional tape or an affidavit indicating there was no such additional tape, correct? Well, not exactly. It's basically, that is correct to a certain extent, but it also deals with a complete timeframe because the date, you're right, is August 29, 2018. But also, in that deposition on C-55, this, Russ Wamanali asked again to the district's attorney if he could produce the video with complete footage rather than one that starts at 839. This is on C-255. So, during the course of, from August 29, 2018 to the present, there's this back and forth between, and this is stated obviously in the plaintiff's motion to compel that, hey, if there's additional footage, just provide it to me. And this is back and forth. Now, at the time, it's going forward, and it does trigger from that particular date to answer your question. It does trigger from that particular date. But this is something where the plaintiff, Ms. Brichetto, it was not any thought process that the district would be withholding evidence or destroying evidence. It may have been oversight. It may have been a delay. So, it's just a matter of going forward at that point and saying, we still don't have the video. Please produce it. We don't want to involve the 201K conference, but we have to at this point because we're proceeding with the case. Okay, and the video, as I understand it, does not actually show Ms. Brichetto falling, does it? It just shows her falling? Yes, the way the surveillance camera works is that it's similar to what you see in stores. It just pans around. So, this particular video that was produced to the plaintiff, Ms. Brichetto, only shows when it panned back around, it only shows her already laying on the ground with the pole there. But what was triggering with Mr. Flanagan was that he apparently, based on his deposition that week, that he saw something else prior to that as to how that pole came to be in the pedestrian walkway. Okay, now this motion for summary judgment that was decided in November, several weeks before the December motion to compel date, had been briefed and had been set on calendar for argument, correct? Yes, that's correct. Was there any motion to continue by the plaintiff? There was not a motion to continue the argument? Yes. No, there was not a motion to continue the argument. Was there an objection to starting the argument when everybody was present before the court? There was a statement by counsel, and again, in terms of, there was not an objection to start the argument. No, that's correct. And my last question would be, did anyone or anything prevent you or your co-counsel from making a motion to continue the matter at least until after the December 6th date? Well, I mean, I will say this, and I think it goes back to probably the timing of this, and I'm not sure if the court is aware of this necessarily, but both of these motions to compel, possibly based upon efficiencies, the motion to compel was a separate motion. But for efficiencies, I guess the court or the parties agreed to have both motions held on the same day. Now, that being said, that probably, in retrospect, created some confusion regarding this, but it still goes back to both motions were held on the same day. The summary judgment motion was held immediately after the motion to compel, and it's actually on the same order, A43 and C726, that describes that the motion was held on that day. Both motions were held on the same day and at the same time. Thank you very much for your answers, and you will have an opportunity for reply if you choose after we hear from, is it Ms. Walsh? Yes, Ms. Walsh. All right, you may proceed. Thank you. Thank you for your time this morning, and may it please the court. As set forth in her brief, summary judgment should be granted under the Tort Immunity Act provisions and on the grounds that Ms. Brocato, as a matter of law, has not sustained her burden to establish the elements of her Wolf and Watt claim. Now, rather than argue the substance of her case, plaintiff is attempting to create a genuine issue of material fact as to the video footage. Now, I want to clarify, because plaintiff indicated that in his motion to compel, he filed it, plaintiff filed her motion to compel in 2015. That's incorrect. It was October of 2018 is when they filed the motion to compel. Now, it can't be ignored that plaintiff did not file her motion until a year and a half after the district verified it did not have additional footage, months after the parties agreed to close discovery, and after defendants submitted its reply brief in support of its motion for summary judgment. And I would be happy to provide you with the definitive timeline if you so request. Now, additionally, as a matter of law, speculation that a poll could have been or might have been lying on the ground for an unreasonable period of time is not sufficient evidence to create a genuine issue of material fact. Plaintiff hasn't offered any facts or evidence to bring her theory beyond mere speculation that the district's conduct caused her to fall. Plaintiff's most recent assertion about Ryan Flanagan's testimony is false. The record, if you read beyond the excerpt that plaintiff provided, the record is very clear that Ryan testified that he watched the video that was produced by the district, and that he did not see from the video the poll being placed on the floor, nor does he know who put it there. And that is in C255 and 256. Now, plaintiff's focus on the video footage is essentially a red herring, as evidenced by the testimony of plaintiff's counsel before the parties argued their summary judgment motion, confirming that she was not relying in any way on the evidence sought in her motion to compel to advance her argument under the motion for summary judgment. Now, though plaintiff points to another statement to diminish the submission, that statement was made before either the motion to compel or motion for summary judgment was argued, and was a reason Judge Krentz held the hearing on the motion to compel first, and then again confirmed with her after it was established that the district did not have any additional video footage, whether she was relying on the evidence sought to advance her summary judgment argument, to which she answered no. Now, there's also no merit to plaintiff's argument that the circuit court erred by granting summary judgment while the motion to compel order was pending, as this district has held that a trial court can properly grant summary judgment, even when ongoing discovery is continuing, and that is the Saladino case. I also want to point out that just from a timeline perspective, the judge issued the motion for summary judgment order on November 27th, so the motion to compel essentially became moot at that time. Now, to be very clear, as indicated to plaintiff's counsel on multiple occasions, and as evidenced by our verification in our discovery responses, no additional footage exists. Therefore, the most plaintiff could gain from this line of attack is an affidavit attesting to such. Now, as a matter of law, an affidavit would neither support plaintiff's claims nor preclude the district's entitlement to immunity under the Tort Immunity Act. Now, turning to the substance of our arguments under the Tort Immunity Act, the district is entitled to immunity under Section 3-106, 3-108, and 2-201. First, there can be no question that Section 3-106 bars plaintiff's claims because her injury resulted from a condition of the district's recreational facility that was being used for a recreational purpose. Now, the case law that we cite in our brief very clearly establishes that misplaced, removable personal property can constitute a condition of public property under Section 3-106. Plaintiff even concedes this principle, and rather than distinguishing from this case law, she focuses on a 25-year-old case, which is not only highly distinguishable, but was taken into consideration in the line of cases we cited, specifically the Grundy case, which fully supports the application of immunity. Additionally, the Illinois Supreme Court in Moore rejected the same argument plaintiff is attempting to make, mainly that under McEwen, Section 3-106 would not apply when an employee allegedly moved and stored a condition, which in that case was snow, negligently on the property. So like Moore and unlike McEwen, plaintiff's arguments are derived from the district's alleged control of the property and based on the existence of the misplaced pole on the property, not the conduct of the district employees or the activity conducted on the property. Now, even more recently, a third district decision, which is BEC 2015 Illinois Policore 3D 140411, held that causing or allowing an object to be positioned in a way that created a hazard without correcting it was not sufficient activity under McEwen to remove plaintiff's claim in the purview of Section 3-106. Now, though plaintiff only briefly argues that the field house is not a recreational facility, I'd be remiss not to emphasize that the precedent clearly and unequivocally establishes that school gymnasiums, particularly those being used for recreational purpose, such as an extracurricular event, like the track meet at issue here, are facilities permitted to be used for recreational purposes under the scope of 3-106. Now, in addition to Section 3-106, 3-108 bars plaintiff's claims that are premised on the district's alleged failure to supervise and negligent supervision of the property and or events. Now, in our opening brief, plaintiff concedes that our allegations involve aspects of supervision. Additionally, the Illinois Supreme Court has broadly defined the term supervision to include coordination, direction, oversight, management, regulation, and implementation. Therefore, the fact that plaintiff does not specifically use the term supervise does not diminish from the supervisory nature of our allegations. Now, plaintiff's argument, which was made for the first time on appeal, is that her claim is not based on the failure to adequately supervise, but on the lack of security and policing. But that doesn't actually save her claim because Section 4-102 of the Tort Immunity Act immunizes such alleged conduct. Therefore, her claim would still be barred as a matter of law. Now, finally, Section 2-201 of the Tort Immunity Act provides complete and absolute immunity, including for willful and wanton claims, for injuries resulting from the exercise of discretionary authority. Now, it's undisputed that the Track and Field Department had and used its discretion when creating policies regarding the management of team's equipment, the design and layout of the field house for the track meet, where the various events would be held and set up within the field house, including where spectators would enter and whether caution tape was going to be used, and whether warning signs were going to be posted. Now, plaintiff's attempt to circumvent the application of 2-201 by arguing that there's no decision about how the misplaced pole vault pole would be managed is illogical because we are not arguing that the district made a decision not to move the pole. But even so, her argument fails because the undisputed facts demonstrate that the district created and implemented policies about the management of the team's equipment, including that each team was responsible for their own equipment, that they were to store their baggage in designated rooms, and that poles had specific areas to be stored, and that they were to contribute an individual to be responsible for the supervision of a specific event. Now, it's noteworthy that plaintiff for the first time is arguing that these facts, along with the fact that the pole did not belong to the district, are in dispute and not supported by the record. Again, her assertions are false, as evidenced by the record, the lack of evidence disputing the facts, and the fact that she included these very same facts in her own statement of facts. So simply because plaintiff is now alleging that the facts are in dispute simply doesn't make it so. Finally, it's undisputed that the facts don't support any finding of willful malign conduct. Significantly, plaintiff hasn't alleged any substantive argument to support her position that she was sufficiently alleging a claim for willful malign conduct. Now, the Tort Immunity Act clearly establishes that it's plaintiff's burden to prove that the district had actual or constructive knowledge of an alleged dangerous condition and knew others had been injured by that condition and still failed to take action. There are absolutely no facts to support these elements. There's no evidence establishing how the pole got there, how long it had been there, or that the district knew of its presence. The deposition testimony of all district employees corroborate this and make very clear that they did not know about the presence of the pole. Given that the track meet was not scheduled to begin for another 20 minutes, it also makes it inconceivable that the pole could have been there for any significant period of time. And most importantly, there were no prior injuries related to the pole. So though plaintiff is arguing that a video could show this, that still wouldn't show that the pole was lying on the ground. That still wouldn't bring her claim sufficiently to adequately plead willful malign conduct. Now, in the absence of any evidence tending to show such notice, Illinois courts have granted summary judgment in favor of the defendant finding it's improper to submit it to the jury. The two cases that highlight this principle are Islo, 2012, Illinois Appellate Court First District, 110919, and Hayes, which is in the third district, 80 Illinois Appellate Court 3D, 1027. Now, for the reasons outlined in our brief and as argued today, summary judgment should be affirmed under any and all of the Tort Immunity Act provisions, and on the ground that Ms. Pepeto, as a matter of law, has not sustained her burden to establish the elements of her claim. Therefore, we respectfully request that the court affirm the circuit court's holding on both counts in this case. Thank you. Thank you, Ms. Walsh. Justice Shostak, do you have any questions? Yeah, briefly, you rely on, let me see, Sylvester case. Isn't that a little different? I mean, that was a concrete barrier that would have been very difficult to remove versus a pole vault that would have been very easy to kick over and move over. Isn't that a distinction on those cases? And wouldn't that make a difference with that video? Well, with the Sylvester case, the holding that we were really looking at is that it was a misplaced concrete bar stop. So that one, the misplaced was really the core focus of it. And then the Grundy case, I pointed it out because it relied on that, the Sylvester decision, in addition to the Rex Road and the McEwen cases, all Illinois Supreme Court cases, when it made the determination that misplaced movable personal property can constitute a condition of public property. And then we cited to a number of other cases, which had more of a transit quality to it. So the Bulimia case is one example where it's still Gatorade on the floor. Right. Let's see, the the McKowsky one had broken glass on a football field that wasn't removed. So, I mean, we cited to a number of cases just to show that cumulatively, I mean, the principles are pretty, pretty clear for that. This, in this case, the pole is should be considered a condition of the property. The discretionary authority under the willful and wanted, he has argued, your opponent has argued and put much weight on the lack of the video minutes before the video in which he got. Would the would the video with the video, if showing, showing that that pole vault was sitting there, would that change the willful and wanton? And if not, why? Why not? Because, again, to so is your question regarding the willful and wanton, whether it's sufficiently alleged or is it related to the discretionary decisions? Well, well, the willful and wanton and the discretionary authority, basically both of them. So, with regard to the willful and wanton to state a claim for willful and wanton under premise liability claim plaintiff has to allege actual or constructive notice of the alleged condition, which they're right. No testimony whatsoever supporting that all of the district employees indicated that they had no idea that the poll was out there. What if the video would show contrary? I mean, isn't isn't the video and I think that's where he's arguing the video would be key to show whether or not there was notice in light of the fact, especially in light of the fact you had one of the employees say, yes, that it was there. Well, if you read the actual transcript of Ryan Flanagan, he says it's there because he watched he watched the video, and when he described the video, it's it's indicated by this. That the video starts at eight thirty nine, and he describes very specifically the exact video that we produced. So, to argue that there is some other video that he watched is just inaccurate and not supported by the actual transcript. If you read beyond what plaintiff's excerpt is, but going back to your original question, not only for willful wanton, not only is the standard. To prove actual or constructive notice, but you have to prove that others had been previously injured by that hole in the district still took no action. There is we, all the deposition testimony, it's undisputed that there were no prior injuries. Prior to miss on the day of the incident related to the polar otherwise, so they would never be able to reach the burden of conduct, even if the video. Even if a video existed, and even if it showed that ten minutes prior, the poll had been laying there. There's also another case that was cited in the summary judgment briefs and it wasn't cited. I don't believe in the appellate briefs because it wasn't brought up, but simply being there for ten minutes or even thirty minutes, I believe, is a threshold isn't sufficient to prove actual or constructive knowledge of a dangerous condition. Yeah, or the other indifference or. Correct. Disregard. Yes, I. Will lead to willful one. I mean, that that component that you need to prove that others had been injured by that dangerous condition plaintiff will never be able to to to reach that to prove that element because the facts don't support it. And then how about his his argument about the spoliation should he not have had an opportunity to raise that regardless of whether or not you feel it would been a waste of judicial resources. In other words, the same result was going to come up that should he not have had that opportunity. Well, and by granting the summary judgment at that point, they deprived him of that. It's our so he wouldn't be able to bring a spoliation claim in our, our opinion for two reasons. One, she had ample time to bring this claim. So we provided a verification in July of 2018 and then confirmed in response to a tool one K letter in November of 2018 that no additional footage existed. And this is after Flanagan's test after Flanagan's deposition, which occurred in August. The parties and agreed to close discovery in July of 2019 and then we briefed fully briefed or summary judgment motion. And it was only at that point after we submitted a reply brief that plaintiff is now seeking a motion to compel for additional video. And it was communicated to the court during that oral argument prior to the summary judgment motion that no additional video exists. And that for that reason, Judge Prince felt that coupled with the fact of plaintiff's statement that she was not going to rely on evidence to support her motion to advance her arguments under the motion for summary judgment. Judge Prince felt comfortable moving forward with the summary judgment motion, knowing that it was only going to be an affidavit attesting that we don't have additional footage. It was it was more of a compromise between the two parties just to resolve this issue in its entirety. But secondly, to the more substantive argument regarding this violation claim to prove that one must show that the party was would be unable to prove the underlying lawsuit. So it's a but for cause standard. And again, for the reason stated both in our briefs and then today plaintiff wouldn't ever be able to prove this for claims because of the immunities afforded under the Tort Immunity Act. And because she wouldn't be able to sufficiently see the claim for willful unwanted conduct because there had been no prior injuries related to the poll on the day of question. So we don't believe that a spoilation claim would ever be a a good faith claim. And regardless, regardless of the spoilation claim, even success on spoilation claims, he would still not be able to prove willful unwanted is your position. Correct. So the spoilation claim, essentially, you're only allowed to bring it if you can not be able to prove your case. But for the evidence, and we're saying that the evidence would not prove Mr. Kato's claim because of the immunities under the Tort Immunity Act. And because she is simply unable to prove the elements of her willful claim, regardless of the video. Okay, thank you very much. I have no further questions. Thank you, Justice Shostak. Justice Jorgensen, do you have any questions? I just have the one question. I mean, can't, can't we and the trial court rely on representations made by the plaintiff that she's not relying on this video as you're going forward with the motion for summary judgment? I'm not quite sure I understand your question. I'm sorry. Could you repeat it? Well, here's the gist of it. If plaintiff makes a representation that she's not relying on what may or may not have been in the mystery video, shouldn't the trial court be able to rely on that? Yes, absolutely. I mean, that's the very reason he asked that question. And then the parties agreed to move forward with the summary judgment motion. Let me ask you this. Why hadn't there been some response to that motion to compel? So we, we actually did. We did not file. I personally drafted a response to the motion to compel. But what happened was, so we submitted our reply brief. And then plaintiff's counsel immediately submitted motions and lemonade because trial was set for, I believe, two weeks after the oral argument was set in addition to motion to strike and then motion to compel. So we had all of those pending and my co-counsel actually went to argue. I believe the hearing was the next day or two days later. So we didn't believe that the judge would be able to read the arguments for the motion to compel if we filed it. And then that case ended up being continued. And we, at that point, just decided to focus our efforts on responding to the motion to strike and our arguments for motion for summary judgment. And just to address our concerns orally, which I believe the, the transcript is included in the record and it sets forth what our arguments would have been. And it's, it's basically the same arguments that we're making now where one, the timeliness of the motion to compel, where you had a year and a half to bring this forward. We all decided to close discovery to move forward with summary judgment. We had a trial court date set. So to now bring this at the 11th hour is simply improper. And then secondly, we've told you numerous times, this video doesn't exist. So it has no bearing on substantive arguments under the Tort Immunity Act and your ability to state a claim for willful wanton conduct to support or to oppose our motion for summary judgment. Okay. I have no other questions. Thank you. Thank you, Justice Jorgensen. Ms. Walsh, you know, notwithstanding the fact that discovery was closed in July of 2019 and you or co-counsel had made numerous representations that no other video existed, the trial court still allowed the motion to compel, didn't it? Yes. Did it cite any of your concerns in issuing that motion to compel? As... You're concerned about delay and you're concerned about discovery being closed? The order that was written by plaintiff's counsel does not include what our concerns were, but they were articulated to the court and included in the transcript of that argument. All right. Now, this track meet was being held in what's called a field house in the briefs. Correct. And I assume this field house is somehow on the campus of Plainfield High School. It is. It's essentially the school gymnasium. Okay. So is... Counsel's argument is that it is actually and maybe primarily an educational facility and not just a recreational facility. And why is that argument not correct? So although the high school, as argued by plaintiff's counsel, may be first and foremost an educational facility, as a matter of law, school property can have more than one intended use. And the undisputed facts confirm that both the field house's use on the day of the incident and more generally was intended and permitted to be used for recreational activities. So the above case, which is an Illinois Supreme Court case, is the primary case that indicates that principle to which school facilities can have more than one intended use. And then we cite to a number of cases, which I believe it's Ozark, Kap, Abrams, and Amasek, which indicate that so long as the gymnasium is used for recreational purposes and beyond simply mandatory physical education, then section 3-106 would apply. So the facts of this case really show that not only was the field house in use on the day of question for an extracurricular event, but also from, I believe it was after 2 p.m. on weekdays. And then throughout on the weekends, it was used for other recreational community events, just more extracurricular events to which it had nothing to do with the actual education focus of the school. Okay. My last area of inquiry is, if we take your argument literally that the track meet hadn't started yet, I think there were about 10 minutes left before it was to start, and nobody had yet been injured, are you actually saying that somebody would have to be injured by that poll prior to Ms. Bruschetto's disagreement with that poll? In order to approve Wilfill and Watton? Yes, under the Wilfill and Watton standard for premise liability, correct. And that is set forth in the Dunbar case. I can provide the site if you'd like. It's also in our brief. And just to clarify, it was not scheduled to begin for another 20 minutes. Okay. Somebody actually has to get injured before the school district is aware that there's a problem. Correct. So if somebody got injured by that poll after Ms. Bruschetto, she just gave him or her grounds. Does that make any sense if somebody is injured when someone can see this poll on the ground and that person knows it doesn't belong there? So that's the distinguishing component for negligence versus Wilfill and Watton conduct. Again, Wilfill and Watton conduct is a much, much higher standard than negligence. I mean, one can make an argument for negligence if someone had actual or constructive notice of a dangerous condition, such as a poll being left there, within a reasonable amount of time to remedy that condition. So that's the standard for negligence. Wilfill and Watton conduct is negligence plus more. And that plus more in this case is knew that others had been injured by it and still failed to take any sort of action. So, yeah, and I just again, I want to point out just because the timeline, I mean, the undisputed facts show that the participants began to arrive simply to warm up. I believe around seven thirty and eight. I don't have the facts right in front of me. And then there was a meeting. So the fact that there was still twenty minutes before the competition had started. I mean, it's really inconceivable that the poll had been there for an extended period of time. And again, that threshold, whether it's around, I believe, ten, thirty minutes, it's not sufficient, even under the negligence standard to show constructive not to show constructive notice. All right, thank you very much. Now, Mr. person, do you have any rebuttal that you wish to make? Yes, just very briefly. Thank you. The most important thing I wanted the court, obviously, the panel to consider is that what we have here today is that we know there is a video that the district did see. And we do know for a fact that is something that the plaintiff did not see. And in terms of this, the assertion essentially that is premature because all of the evidence was not considered. With respect to the arguments regarding the court immunity again, the plaintiff will rest on the arguments that were made in the written brief, which address those in terms of any misstatements. Those were also be addressed in the written statement, the written brief or written reply brief that the panel has reviewed. But the most important thing I wanted to say in rebuttal is that the trial counsel, in this case, absolutely positively did not weigh the issue in terms of motion to compel. Because logically speaking, why else would the motion to compel been brought if it was not key to the case to show how the pole vault came into came to be in the pedestrian walkway. So the question that was asked previously about, can a panel rely on statements from counsel? This is a statement statement counsel in this case is not evident, and it was not a intention to weigh something that is so critical to a case that had been proceeding for two and a half years. And as was stated, the order was in place motion to compel the court found that it was worthy to proceed. And again, would ask that the court reverse the summary judgment granted based upon the oral argument today and also the written brief that was submitted. Thank you. All right. Thank you. Mr. Person justice. Do you have any questions based upon that argument? None. Thank you, sir. Nor do I think justice Jorgensen. I have none. Thank you. All right. I believe at this point I will, I will also follow suit. And we thank you for your attendance at this. At the strange oral arguments, we will issue a decision in due course. And this, this court will now stand in recess to prepare for a next argument. And Mr. Kaplan, if you go online, would you briefly explain the delay to counsel? Will do. Thank you. Thank you. Thank you.